**BROOKSHIRE BROS., INC., Appellant,**

**v.**

**Mrs. Odie CHERRY, Appellee.**

**No. 90.**

Court of Civil Appeals of Texas.

Tyler.

Jan. 28, 1965.

Rehearing Denied Feb. 25, 1965.

Herbert Boyland, of Kenley & Boyland, Longview, for appellant.

Tom Bankhead and T. G. Davis, Carthage, for appellee.

SELLERS, Justice.

Mrs. Odie Cherry, as plaintiff, brought this suit to recover for personal injuries received by her while shopping in Brookshire Bros., Inc.'s store, as defendant. The jury found issues in plaintiff's favor and assessed her damages at $17,750. From this judgment the defendant has duly prosecuted this appeal.

The defendant, by several assignments of error, complains that there is no evidence to support the jury's verdict of negligence on the part of the defendant, and we are of the opinion this contention must be sustained. The jury found from the issues submitted that Mrs. Odie Cherry slipped while in Brookshire Bros. store on or about Friday, January 13, 1961; that she slipped on a turnip green leaf; that she sustained injuries to her body; that the turnip green leaf in question had been on the floor for a sufficient length of time for the defendant's agents, servants, or employees in the exercise of ordinary care to have discovered and removed the same; and that such failure to discover and remove the turnip green leaf from the floor by the time the defendant, Mrs. Odie Cherry, slipped was the proximate cause of Mrs. Cherry's injuries. The jury further found that the defendant did not fail to sweep the floor of its store at frequent intervals on the occasion in question.

Other findings of the jury were to the effect that the defendant did not make regular and periodic inspection of the floor of its store on the occasion in question; that said failure was negligence and the proximate cause of the plaintiff's injury.

This kind of case is not uncommon, and the courts have now held that, in order for a plaintiff in this character of case to recover, the burden is on the claimant to show one of three things, to-wit:

"1) That the Defendant put the foreign substance on the premises, or

"2) That the Defendant knew the foreign substance was on the premises and willfully or negligently failed to remove it, or

"3) That the foreign substance had been upon the premises for such a period of time that it would have been discovered and removed by the Defendant had the Defendant exercised ordinary care."

J. Weingarten, Inc. v. Tyra, Tex.Civ.App., 381 S.W.2d 215, and cases therein cited.

Three witnesses testified about the turnip green leaf on the floor of the aisle where the plaintiff slipped. The first witness was Linwood Porter, brother-in-law of Mrs. Cherry. He testified that he entered Brookshire's store about 12:30 on the date in question; that he got himself a buggy and proceeded down the isle on the right-hand side of the store; that this aisle is about six or seven feet wide and some 90 or 100 feet long; that he shopped in this store about twice a week and was familiar with the store. The dairy mart was at the far end of the aisle from which he entered. With reference to the leaves that he observed on direct examination, he testified:

"Q  All right sir. Did you notice anything unusual on the floor of the store?

"A  Well, I noticed some leaves on the floor.

"Q  What kind of leaves?

"A  It was turnip green leaves.

"Q  How many of these leaves did you see or did you count?

"A  Well, I didn't count them. There was more than one.

"Q  All right sir. Could—did you notice the appearance of these leaves?

"A  Well, they looked bruised. They'd been laying there few hours.

"Q  Did the leaves appear to be clean or dirty on top?

"A  They was dirty.

"Q  About what position in the aisle were these leaves located?

"A  Well, there was one in particular almost in the center aisle and there was more laying on the side.

＊  ＊  ＊  ＊  ＊  ＊

"Q  All right sir. Was there any particular reason you happened to see these leaves on the floor?

"A  Well, I generally keep my eye on the floor as I go down.

"Q  Why were you looking down at the floor Mr. Porter?

"A  Well, I just—my eyes go backwards and forwards, up and down and the main reason—＊ ＊ ＊."

On cross examination:

"Q  And how many leaves did you see?

"A  Well, I saw more than two.

"Q  How many?

"A  Well now I didn't stop and take count how many and count all of them. I know there was 2 or 3.

"Q  Over what areas were they?

"A  Over 5 or 6 foot area.

"Q  You say there were at least three?

"A  Yeah.

"Q  And you observed them well enough that you could tell they appeared to be bruised?

"A  I did.

"Q  All three of them appear to be bruised?

"A  Yeah.

＊  ＊  ＊  ＊  ＊  ＊

"Q  Did you—now then, with reference to the—up and down the aisle, were they close to one end or close to the other end of the aisle?

"A  Well, as coming down the aisle they was nearer the far end, back west of the building. Vegetables is on that end of the aisle.

"Q That would be back towards the dairy case wouldn't it?

"A That's right.

"Q The vegetable counter is on the north side of the building, isn't it?

"A That's right.

"Q And these—what you saw would have been back west towards the dairy counter, is that correct?

"A Well, I don't know as be west of the dairy counter.

"Q Towards—I said west towards the dairy counter?

"A Yeah.

"Q Did you say about how far they would be back towards the back of the store there or how far they were from the dairy counter?

"A Oh, they was 12 or 15 feet.

"Q About how long is that aisle please sir?

"A I would say it's in the neighborhood between 90 and 100 feet.

\* \* \* \* \* \*

"Q And you didn't see anything until you got back there on the floor did you, any turnip greens?

"A No, not till I got down to where the vegetables was.

"Q And you saw at least three and they were all three bruised?

"A That's right.

"Q Did you pick them up?

"A No, I didn't need them.

"Q Did you go around them?

"A I stepped around them.

"Q Did you have to move your cart to get around them?

"A I didn't move it to go around them.

"Q Did you roll over them?

"A Yeah, one of them I did.

"Q About how far from them were you when you saw them?

"A Five or 6 feet.

\* \* \* \* \* \*

"Q And you could see these—at least three leaves plainly yourself couldn't you?

"A That's right.

"Q Had no difficulty seeing them did you?

"A No.

"Q They were there open and obvious there on the floor weren't they?

"A Yeah.

"Q And you don't know of your own personal knowledge whether or not what you saw is what your sister-in-law saw or slipped on if she slipped on it later do you?

"A No, I don't know it to be a fact."

Mrs. Odie Cherry testified as follows:

"Q Mrs. Cherry, have you ever had occasion to shop in Brookshire Bro's store here in Carthage?

"A Yes.

"Q Did you have occasion to be in the store there on January 13th, 1961?

"A Yes.

\* \* \* \* \* \*

"Q Is that Brookshire Bro's store here in town?

"A Store in Carthage.

"Q About what time of day was that please ma'm?

"A Well, I don't—I didn't see a clock but I imagine it was around 5 o'clock.

\* \* \* \* \* \*

"Q All right. Mrs. Cherry, where did you enter the store?

"A From highway 59, on the east side. Front door.

"Q Is that commonly known as the Tenaha highway—

"A Yes.

"Q—In Carthage. All right, what did you do as you entered the store?

"A I stopped and got article—

"Q Where was that article Mrs. Cherry?

"A It was kind of behind one of the checkers.

"Q There close to the checker stands?

"A Uh-huh. It was stacked behind the checker stand.

"Q All right. Where did you go next?

"A I started down the aisle towards the dairy case.

"Q Which aisle was this Mrs. Cherry?

"A That was the aisle of vegetables, next to vegetable counter.

"Q Which aisle in regard to the rest of the aisles in the store?

"A Oh, it was on the—it was on the west side. I mean the north side. I'm confused there little. It was on north—

"Q Would that be the extreme right hand aisle as you enter the store?

"A Yeah, uh-huh.

"Q All right. What do they have on that aisle Mrs. Cherry, when you went in?

"A Well, there's vegetables.

"Q All right. Vegetables. On which side of the aisle are they?

"A They're on the right side.

"Q All right. What's on the other side?

"A Canned goods.

"Q Which side of the aisle were you walking down as you proceeded toward the end of the store?

"A Left side.

"Q Left side of the aisle?

"A Yes.

"Q That would be the side next to the canned goods, is that correct?

"A Yes.

"Q All right. What happened then?

"A Well, I just walking down there and all of a sudden, well I stepped on something and my foot slipped way out in front of me and my body twisted and I threw my hand up and I hit that counter and bumped those cans and when I got straightened up—

"Q What—is that what kept you from falling?

"A Yes, that's what kept me from falling.

"Q Which foot did you step on this—

"A My right one. My heel caught the—

"Q Okay. What happened then?

"A Well, when I got straightened up, Mr. Sistrunk came around where I was at—

"Q Now excuse me just a minute. Did you feel any unusual sensation immediately after—

"A Yes, I thought I had torn something loose in my stomach.

*   *   *   *   *   *

"Q All right. At that time did you look to see what you stepped on?

"A Yes, I looked.

"Q What was it?

"A It was a turnip green leaf.

"Q Would you describe the appearance of this turnip green leaf?

"A Well, it wasn't—it wasn't brown. It seemed to be just a turnip green leaf. It wasn't—

"Q Was it green in color?

"A It was green in color. It wasn't brown or anything like that.

"Q All right. Did you pick it up or examine it closely or anything?

"A No, it scared me when I slipped.

"Q Did you pay any particular attention to it at that time?

"A No, after I looked down to see what it was, I was already scared and sick.

"Q All right. What happened next?

"A Mr. Sistrunk came around there.

"Q Excuse me. Who is Mr. Sistrunk?

"A He works at Brookshires.

"Q You know what his capacity is there or what his job is at the store or title?

"A Well, I think he takes care—I'm not sure of this. I think he takes care of—suppose to take care of the vegetables.

"Q All right. What did he do, if anything?

"A He walked over and put his hand on the vegetable bin and I told him, I said 'I slipped—'

"Q You have any conversation with him at that time?

"A Yes.

"Q What was that conversation?

"Q Proceed then Mrs. Cherry.

"A He came around and I showed him what I had done and I said 'I have slipped on that and I have hurt myself' and he told me, said—

"A And he told me if I really wanted to slip good to slip on one of them green beans.

"Q All right. Say anything else to you at that time?

"A I turned and walked off.

"Q All right, Did you say anything else to him?

"A No.

"Q Did you see him pick up the turnip green leaf?

"A No, I did not.

"Q Do you at this time know what happened to that turnip green leaf?

"A No, I do not.

"Q What did you do next after you turned?

"A I went to the checking counter.

*   *   *   *   *   *

"A I told the girl that I had slipped and hurt my back or my stomach or something, I—and she said— And I told her that I had slipped and I had hurt myself and she asked me would I like for her to get me a chair.

"Q What was this lady's name, did you know her?

"A Miss Ida Bell Bailey.

"Q All right. Did she get you a chair?

"A No, she told me the manager was gone. I said 'I'm going to try to get home Ida Bell. I am sick. I am hurting and I'm—'"

On cross examination:

"Q Mrs. Cherry you recall what kind of floor was in the store that day?

"A What do you mean what kind of floor?

"Q Was it tile floor like this one here in the courtroom or was it some other—

"A It was tile.

"Q The store was lighted up all right from the lights and from outside light wasn't it?

"A As far as I was concerned it was.

"Q You had no difficulty in seeing around because of the light did you?

"A Not that—not on the light.

"Q All right. And do you know how wide that aisle was that you were going down?

"A I really don't but I'd imagine it was around 6 or 7 foot wide.

"Q All right. Now then, there was no other obstruction there in the aisle such as any extra counter or anything was there?

"A What do you mean extra counter in the—

"Q In the aisle itself. The aisle was open wasn't it?

"A Well, there wasn't anything out in the middle of the aisle—

"Q That's what I mean.

"A —if that's what you mean.

"Q And as you started down that aisle you could see all the way to the dairy case couldn't you?

"A Yes.

"Q Now I believe it's true isn't it that you do not know where it was up and down that aisle that this accident happened?

"A I don't know where it happened. What do you mean?

"Q By that I mean you do not know whether or not you were a fourth of the way down towards the dairy case, half way—

"A When I slipped it scared me and I didn't estimate that at the time.

"Q All right. My question is and I'll try to ask questions that you can answer by yes or no. My question is you do not know how far you were down the aisle when the accident happened to you?

"A I wouldn't say that because—

"Q Were you at least half way down the aisle?

"A I wouldn't say that.

"Q Would you say whether or not you were a fourth of the way down the aisle?

"A I wouldn't say that.

"Q Or three-fourths of the way down the aisle?

"A I wouldn't say that.

"Q Now it's true isn't it that as you started down that aisle you never looked down at the floor?

"A I did not.

"Q Do you know how long that aisle is Mrs. Cherry?

"A I do not.

"Q  Have you been back in there since then?

"A  Yes I have.

"Q  Have you ever been there while any measurements were made?

"A  No, I have not.

"Q  Did you ever look at the object that you say you slipped on enough to identify it?

"A  I looked down.

"Q  What was it?

"A  I seen that it was a turnip green leaf.

"Q  You say—you saw only one turnip green leaf didn't you?

"A  I didn't survey the store afterwards because it scared me.

"Q  I asked you whether or not you saw more than one leaf?

"A  I didn't look for anything else.

"Q  Did you see more than one leaf?

"A  No, I didn't.

"Q. You did look at this leaf long enough and sufficient enough to tell that it was a large leaf didn't you?

"A. Yes.

"Q  Now then, as I understand your testimony, you looked down on the floor and saw the leaf?

"A  No, I didn't say I looked—

"Q  I mean after the accident?

"A  Yes, after the accident I looked down on the floor.

"Q  How far were you standing from it please?

"A  Well I—when my foot slipped well naturally it moved the leaf.

"Q  Did the leaf move with your—

"A  The leaf moved with my foot.

"Q  Then the leaf was directly at your feet?

"A  No, not when I—you mean when it slipped?

"Q  No ma'm, after it was over with and you looked down and saw what you saw, was—where was it from your feet?

"A  Well, I done straightened up when I looked down and the leaf was off away from me then.

"Q  How far away from you was it Mrs. Cherry?  As far as—assuming that you're standing up where you are.  Would it be as far away from you as this piece of paper is on the floor when you looked at it or further or closer or—

"A  Well, I couldn't say that.  I wouldn't say that, how far it was because I didn't—I didn't measure it.  I don't know and it scared me.

"Q  All right.  What is your best judgment as to how far it was?

"A  I wouldn't say that because I didn't measure it and I wouldn't know.

"Q  Could it have been as far as this piece of paper is?

"A  I wouldn't say that.

"Q  But you did—to use your own words, did say that you were standing away from it when you looked?

"A  When I—when I took my foot up.  When I pulled my foot back but the mark was on the floor.

"Q  My question though Mrs. Cherry was you were standing off away from the leaf when you looked at it?

"A  When I straightened up and looked down and seen what it was.

"Q  But you looked at it good enough to tell, No. 1, that it was a large leaf didn't you?

"A  Yeah.

"Q  You looked at it good enough and long enough to tell it had a stem on it didn't you?

"A  Yes.

"Q  You looked at it good enough and long enough to tell that you had stepped on the stem didn't you?

"A.  Yes.

"Q  And you looked at it good enough and long enough to tell that it left a green streak on the floor?

"A  Yeah, I stood there a while after I stepped on it.

"Q  And did you point it out to Mr. Sistrunk when he came up?

"A  I sure did.

"Q  You looked at it good enough and long enough to tell it was green and not brown didn't you?

"A  I looked at it—I wouldn't say that it wasn't—I just know it was a turnip green leaft. It scared me when I stepped on it.

"Q  All right. Now then my question was though that you looked at it long enough to tell that it was green and not brown didn't you?

"A  Well, it wasn't no dried up one. I'll say that.

"Q  Didn't you say this morning in response to a question by Mr. Davis that it wasn't brown or anything like that?

"A  I said that as far as I knew that it wasn't brown or drawed up like

that. He asked me was it a green leaf.

"Q  Well, to get back to my question though, didn't you say this morning in reply to a question by Mr. Davis that it wasn't brown or anything like that?

"A  Well, it wasn't brown. If it had been brown I might not could have told what it was.

"Q  Now then, it looked green and fresh didn't it?

"A  I wouldn't say that.

"Q  When your deposition was taken you were asked if it appeared to you it was fresh and you said 'Yes' didn't you?

"A  I don't think so. Mr. Earl Sharp taken my deposition and—

"A  He had me so nervous—

*  *  *  *  *  *

"Q  Mrs. Cherry, I believe that I was asking you about whether or not you had ever stated that this turnip green leaf and stem appeared to you to be fresh. Have you ever made such a statement?

"A  I said I looked down and it looked green.

"Q  You recall Mrs. Cherry your deposition has been taken in this case. I believe it was taken on May 4th, 1962. You recall the occasion of your deposition—you recall it was taken?

"A  Yes.

"Q  You recall before your deposition was taken that you were placed under oath and all questions and answers were made under oath?

"A  Yes.

"Q  And do you recall Mrs. Cherry that thereafter on May the 15th,

1962, you signed the deposition or shows it was subscribed and sworn to on May 15th, 1962, before a Notary Public here in Panola County?

"A Yes, sir.

"Q And you recall this question asked you. 'And from where you looked at it it was a green turnip green leaf and stem?' And your answer was 'Yes, sir,' Next question: 'And it appeared to you that it was fresh?' You answered 'Yes'.

"A I said it appeared to. I didn't say it was.

"Q And you don't know about this turnip green leaf having any dirt or rotten places on it do you?

"A I didn't look at it that good.

"Q You didn't see any on it from where you were standing?

"A I didn't look at it that good. I just looked down—

"Q Well, whether—my question is, did you see any on it when you looked down there at it?

"A I wouldn't say I did or I wouldn't say I didn't. I don't know.

"Q You don't recall seeing any though do you?

"A No, I don't.

"Q All right. I believe we've already —you've already mentioned that you did not see any other leaf except that particular one?

"A It scared me and I didn't look.

"Q Well, you did not see any other leaf but that one did you?

"A No, I did not.

\* \* \* \* \* \*

"Q Mrs. Cherry, did you see this turnip green leaf before you stepped on it?

"A No I did not.

"Q Where were you looking as you proceeded down the aisle?

"A I was looking down at the dairy case.

"Q Mrs. Cherry, where there vegetables and groceries on each side of this aisle as you proceeded down it?

"A Well I suppose. Groceries on one side and canned goods on one side. The vegetables on the other side.

"Q And then where was the milk?

"A It was in the back.

"Q At the end of the aisle?

"A Yes, in the dairy case.

"Q Were those products that you saw there all displayed for sale by the store?

"A What—explain what you mean.

"Q Were they there for customers to pick up and put in their shopping bags if they saw fit?

"A Yes. \* \* \*"

The Witness Sistrunk testified as follows:

"Q All right. What are your duties specifically for Brookshire Brothers?

"A I'm produce manager.

"Q Tell the jury, if you would, just what being produce manager means?

"A Taking care of all the produce. Seeing that everything is well kept. Also taking care of the aisle that the produce counter is on. Buying the produce, marking it for sale.

"Q Mr. Sistrunk were you working for Brookshire Brothers on January 13th, 1961?

"A I was.

"Q Were you working as produce manager at that time?

"A I was.

"Q I'll ask you if—where in the store do you spend most of your working time Mr. Sistrunk?

"A Most of it up and down the produce aisle.

"Q All right. Would that be on the aisle that's nearest to the north wall?

"A Right.

"Q And that is the aisle where the vegetables, fruits and other produce is kept?

"A That's right.

"Q All right sir. Is it your responsibility to put the produce in the bins where they're kept?

"A It is.

"Q All right sir. Mr. Sistrunk, as an employee of Brookshire Brothers, are you given instructions as to the care of the floors?

"A I am.

"Q Tell the jury what those instructions are.

"A We all have instructions to remove any—

"Q All right. Go ahead Mr. Sistrunk and tell the jury what you started to please sir.

"A We all have instructions to watch the floor at all times for any foreign objects and no matter where it is nor what we're doing, to remove that object at any time. Immediately. Drop whatever we're doing and take any object off the floor that might be dangerous or might mar the looks of the store.

"Q Mr. Sistrunk, do you—do you do any sweeping?

"A I do.

"Q What do you sweep generally, sir?

"A The produce aisle.

"Q All right.

"Q Do you remember January 13th, 1961?

"A I do.

"Q Did you sweep that day?

"A I did.

"Q What did you sweep?

"A The produce aisle.

"Q All right sir. I'll ask you on that day what time you went to lunch?

"A 11:30.

"Q All right sir. What time—did you leave the store when you went to lunch?

"A I did.

"Q What time did you get back into the store?

"A One o'clock.

"Q What did you do when you first got back to the store?

"A I checked the produce aisle, swept—to see if there was any objects on it and swept it.

"Q All right sir. That's the aisle that's in front of the produce counter, is that right sir?

"A That's right.

"Q All right. In addition to—on January 13th, 1961, particularly calling your attention to that afternoon sir, did you in addition

to sweeping the floor, did you make any inspections of the floor?

"A I made regular inspections all afternoon.

"Q All right sir. Tell the jury just how you made these inspections? What you would do?

"A Well I usually have to go to the back of the store to the cooler for produce to add to the rack, as I have to, and when I come back with that produce I always inspect the aisle and if there's any foreign substance on it, I remove it immediately.

"Q All right. Then that afternoon you did make those inspections?

"A I did.

"Q All right sir. I'll ask you if you recall on January 13th, 1961, seeing this lady, Mrs. Odie Cherry, in the store?

"A I did.

"Q About what time was that?

"A Approximately 5 o'clock.

"Q All right. Where did you see her? On what aisle?

"A She was on the produce aisle.

"Q All right. Did you have some conversation with her?

"A I did.

"Q Did she report something to you?

"A She did.

"Q What did she tell you?

"A She told me that I had better pick up this turnip green leaf.

"Q Yes, sir.

"Q Before someone falls on it. Said 'I have already slipped on it.'

"Q She did not tell you she fell?

"A No, sir.

"Q All right. Did you have an opportunity to inspect the floor around where Mrs. Cherry was standing?

"A I did.

"Q Did you see—did she point out anything in particular to you?

"A Nothing only the turnip green leaf.

"Q Did you look around the floor elsewhere in that immediate vicinity?

"A I did.

"Q Did you see anything else?

"A No, I did not.

"Q Only thing you saw was one turnip green leaf?

"A One turnip green leaf.

"Q Had you been in the back right before that happened?

"A I had.

"Q All right sir. And then were you enroute up to the front of the store?

"A I was.

"Q And that's where Mrs. Cherry spoke to you?

"A That's right.

"Q All right sir. Did you have—

"Q Did you examine the leaf Mr.—

"A I did.

"Q All right. Tell the jury what it looked like to you?

"A It was full grown turnip leaf, fresh one, approximately 12 inches long and was still damp where it

had been—had recently come from the produce rack.

"Q What color was it?

"A Green.

"Q Was the leaf itself bruised?

"A No.

"Q Was any part of it bruised?

"A The stem was.

"Q With reference to the floor of the store Mr. Sistrunk, where was the leaf pointed out to you?

"A Approximately 25 feet from the front of the produce counter."

On cross examination:

"Q What side of the aisle was it on?

"A On the side next to the pickle rack.

"Q Have you looked at this drawing here Mr. Sistrunk, during the noon hour?

"A No, I haven't.

"Q Wasn't shown to you?

"A No.

"Q Could you take a look at this please sir and assuming this is the front of the store and this is the produce aisle you're speaking of—

"A That's right.

"Q And this is the produce racks or bins along this wall and I think it has been established it's some 52 feet in length there. Would you take the chalk and indicate where this leaf was?

"A This is the produce rack.

"Q I believe it has been said this is refrigerated part of the rack and then this is the dry area of the rack.

"A Right along there I would say.

"Q All right. Was it closer—was it closer to the canned goods side than it was the produce side?

"A Yes, sir.

"Q About how far from the canned goods side was it?

"A Two or 2½ feet.

"Q Two or 2½ feet. If the aisle is 7 feet across there, be close to the middle?

"A No, if the aisle was 7 feet it would be 2 feet from the pickle rack, put it 5 feet from the produce rack.

"Q Closer to 2 feet than 2½?

"A Well I wouldn't say that. I didn't measure it.

"Q About 2 or 2½ feet from the pickle rack?

"A Right.

"Q As you have indicated here, that is just about middle ways of this entire aisle? Is that—

"A Well, it's a little closer to the back than to the front.

"Q All right. Now—

"A I mean to the front than the back is what I mean, or else closer to the back of the refrigerated produce rack.

"Q It's not drawn in proportion and if you need to move that particular spot then on this drawing to make it more accurate or you think that pretty well represents where it is in relation to the—

"A Well, the way that's drawn, it was probably not exact.

"Q It was 25 feet—32 feet of refrigeration and about 25 feet up the refrigerated part.

"Q Would you move it for me. I don't want to—

"A Well, I don't want—

"Q Would it be here?

"A If I had a ruler or something I probably could move it better but it's 25 feet from here up to where it would have been even with it. It's 32 feet there. Other words, I should leave about 7 feet there.

"Q All right. Maybe move it slightly but not a great deal, is that correct?

"A That's correct.

"Q Now you saw that the leaf twas on the floor?

"A It was.

"Q Did you hear Mrs. Cherry when she bumped the—the pickle counter side and rattled the cans?

"A I did not.

"Q That did not attract your attention to come around and see—

"A No, sir.

"Q Where were you immediately before coming up the aisle to see her?

"A In the back of the store.

"Q What were you doing back there?

"A As best I can remember I was preparing lettuce to put on the rack. I'm not positive of that. I wouldn't say for sure what I was preparing. I was preparing something to bring up to the rack.

"Q You're not sure exactly what?

"A I wouldn't say exactly what.

"Q Was this door closed, the back, whenever you were preparing the lettuce?

"A Well I'm sure it was. It's swinging door.

"Q You didn't hear any unusual noise that attracted your attention?

"A I did not. * * *"

In view of the evidence above quoted, the plaintiff, in order to recover, must depend upon the third ground of recovery set out above, and that is the turnip green leaf had been on the floor of the aisle a sufficient length of time for the defendant's employees to have discovered and removed the same. In order to establish this, the plaintiff had the burden of establishing that the turnip green leaves seen by Mr. Porter remained on the floor from 12:30 until 5 o'clock and plaintiff slipped on one of those leaves. We are of the opinion that this jury's finding cannot find support in the evidence. In the first place, the leaves that Mr. Porter saw were brown, dirty and dry, and were some distance farther down the aisle than the leaf on which the plaintiff slipped. The leaf upon which the plaintiff slipped was green, was not dirty and dry. In addition to this, the jury found that the defendant swept its floors at frequent intervals on the occasion in question. This finding by the jury is in keeping with the testimony of Sistrunk who said he swept the floor after Mr. Porter saw the leaves on the floor.

In the light of these undisputed facts, we think it must be held that there is no evidence in the record that the leaf on which the plaintiff slipped had remained on the floor for a sufficient length of time for the defendant's employees to have discovered and removed the same before the accident occurred.

In this connection, the facts further show that this was a busy day in the store and a large number of people had shopped in the store on that day. We think our holding is

supported on both the facts and law by the case of Worth Food Markets, Inc. v. Le Baume, Tex.Civ.App., 112 S.W.2d 1089.

This court concludes that there is no evidence in the record that will support the jury's verdict, and for this reason the judgment is reversed and here rendered for the defendant.